1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**O'CONNOR & MIKHOV LLP**
Steve Mikhov (SBN 224676)
Alastair Hamblin (SBN 282044)
Amy Morse (SBN 290502)
1801 Century Park East, Suite 2300
Los Angeles, CA. 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

**DANIELS FINE ISRAEL**
**SCHONBUCH & LEBOVITS LLP**
Moses Lebovits (SBN 66552)
1801 Century Park East, Floor 9
Los Angeles, CA 90067
Telephone: (310) 556-7900
Fax: (310) 556-2807

Attorneys for Plaintiffs,
WHITNEY S. GRAVEL and
MIKE GRAVEL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WHITNEY S. GRAVEL and**<br>**MIKE GRAVEL,**<br><br>         Plaintiffs,<br><br>    vs.<br><br>**VOLKSWAGEN GROUP OF AMERICA,**<br>**INC., a New Jersey corporation, d/b/a**<br>**VOLKSWAGEN OF AMERICA, INC.,**<br>**MATHEW ENTERPRISE, INC., a**<br>**California Corporation, d/b/a**<br>**SERRAMONTE VOLKSWAGEN, and**<br>**DOES 1 through 10, inclusive,**<br><br>         Defendants. | Case No.: 3:17-CV-01415<br><br>Unlimited Jurisdiction<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. **FRAUD IN THE INDUCEMENT -**<br>   **INTENTIONAL**<br>   **MISREPRESENTATION**<br>2. **FRAUD IN THE INDUCEMENT -**<br>   **CONCEALMENT**<br>3. **VIOLATION OF THE**<br>   **CONSUMERS LEGAL REMEDIES**<br>   **ACT**<br>4. **VIOLATION OF THE SONG-**<br>   **BEVERLY ACT – BREACH OF**<br>   **IMPLIED WARRANTY** |

Plaintiffs, WHITNEY S. GRAVEL and MIKE GRAVEL, allege as follows against Defendants, VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, d/b/a VOLKSWAGEN OF AMERICA, INC., MATHEW ENTERPRISE, INC., a California Corporation, d/b/a SERRAMONTE VOLKSWAGEN, and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

## DEMAND FOR JURY TRIAL

1.      Plaintiffs, WHITNEY S. GRAVEL and MIKE GRAVEL, hereby demand trial by jury in this action.

## GENERAL ALLEGATIONS

2.      Plaintiffs, WHITNEY S. GRAVEL and MIKE GRAVEL ("PLAINTIFFS"), are individuals residing in the City of Burlingame, County of San Mateo, State of California.

3.      Defendant, VOLKSWAGEN GROUP OF AMERICA, INC., d/b/a VOLKSWAGEN OF AMERICA, INC., (hereafter "Volkswagen" or "Defendant"), is and was a New Jersey corporation registered to do business in the State of California with its registered office in the City of Sacramento, County of Sacramento, State of California.

4.      Defendant, MATHEW ENTERPRISE, INC., d/b/a SERRAMONTE VOLKSWAGEN  (hereafter "Dealer"), is and was a California Corporation registered to do business in the State of California with its registered office in the City of Colma, County of San Mateo, State of California.

5.      Plaintiffs do not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under the provisions of section 474 of the Code of Civil Procedure.  Defendant Does 1 through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiffs.  Plaintiffs will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendants, together with appropriate charging allegations, when ascertained.

FIRST AMENDED COMPLAINT

6.      All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

7.      Each Defendant, whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

8.      On January 24, 2015, Plaintiffs purchased a new 2014 Volkswagen Jetta Sportwagen TDI, VIN: 3VWPL7AJ9EM625973 ("the vehicle"), and express warranties accompanied the sale of the vehicle to Plaintiffs by which Defendant Volkswagen undertook to preserve or maintain the utility or performance of Plaintiffs' vehicle or provide compensation if there was a failure in such utility or performance. The sales contract is attached hereto and incorporated by its reference as Exhibit 1.

9.      The vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty, including, but not limited to, a defeat device that was programmed to give false emissions readings during emissions testing despite the vehicle emitting hazardous chemicals during normal operation at rates exceeding legal California emissions standards.

10.     Plaintiffs hereby revoke acceptance of the sales contract.

11.     Plaintiffs hereby demand trial by jury in this action.

## STATEMENT OF FACTS

12.     Plaintiffs purchased a 2014 Volkswagen Jetta Sportwagen TDI from Serramonte Volkswagen.  Unbeknownst to Plaintiffs, at the time of acquisition the vehicle was equipped with a so-called "defeat device, designed specifically to cheat on emissions tests, bypass California emissions standards and deceive consumers and regulators.

13.     Before purchasing the vehicle, Plaintiffs conducted research and reviewed advertisements regarding Volkswagen's "clean" diesel vehicles, which led Plaintiffs to believe that the vehicle was good for the environment and fuel efficient.

FIRST AMENDED COMPLAINT

14.     Representations regarding fuel efficiency and emissions, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiffs into purchasing the vehicle.  Due to the inclusion of the defeat device, however, the vehicle could not deliver the high performance that was advertised, including the low emissions and fuel economy.  As a result of Volkswagen's conduct, Plaintiffs have suffered harm.  Volkswagen's conduct is a direct and proximate cause of Plaintiffs' damages.  But for Volkswagen's fraudulent concealment of presence of the defeat device, Plaintiffs would not have purchased the vehicle.

**<u>Volkswagen's Plot to Illegally Circumvent California Emissions Regulations</u>**

15.     In or around 2005, following the success of environmentally friendly vehicles such as the Toyota Prius, Volkswagen made the decision to focus on "clean" diesel technology to achieve its market share of "green" vehicle consumers.

16.     Volkswagen spent millions of dollars in research and development in the production of the EA 189 TDI ("TDI" stands for "turbocharged direct injection") diesel engine.

17.     At the time of development, diesel engines made up just 5% of the U.S. car market and Volkswagen saw an opportunity to become the market leader through this so-called "clean" diesel; however, in order to capitalize on the "green" vehicle market, Volkswagen needed to overcome public stigma associated with diesel technology, which included the perception that diesel engines emit high levels of toxic pollutants.  With the TDI, Volkswagen claimed to have drastically limited toxic emissions.

18.     Volkswagen marketed the TDI as a "clean" diesel alternative to other environmentally friendly green engines, such as hybrids and electric cars.

19.     Behind the scenes, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints.  Volkswagen mandated the development of a diesel engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and fuel consumption, all while meeting the strict $NO_x$ emission standards in California.

/ / /

20.    $NO_x$ is a generic term for the mono-nitrogen oxides NO and $NO_2$ (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases in the air during combustion.  $NO_x$ is produced by the burning of fossil fuels, but it is particularly difficult to control from the burning of diesel fuel.  $NO_x$ is a toxic pollutant, which produces smog and a litany of environmental and health problems, as detailed further below.

21.    Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which tend to produce a more efficient vehicle.   In fact, diesel engines can convert over 45% of diesel's chemical energy into useful mechanical energy, whereas gasoline engines convert only 30% of gasoline's energy into mechanical energy.  To make use of this dense diesel fuel, diesel engines combine under high pressure to ignite a combination of diesel fuel and air through "compression ignition," as opposed to gasoline engines that typically use electric discharge from a spark plug to ignite a combination of gasoline and air through "spark ignition."  Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of $NO_x$ and particulate matter ("PM"), or "soot" than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion.  One way $NO_x$ emissions can be reduced by adjusting the compression and temperature, but that in turn produces PM, a similarly-undesirable hydrocarbon-based emission.  Another way $NO_x$ emissions can be reduced is through expensive exhaust gas after treatment devices, primarily, catalytic converters, that use a series of chemical reactions to transform the chemical composition of a vehicle's $NO_x$ emissions into less harmful, relatively inert, and triple bonded nitrogen gas ($N_2$; just over 78% of the Earth's atmosphere by volume consists of $N_2$) and carbon dioxide ($CO_2$).

22.    Diesel engines thus operate according to this trade-off between price, $NO_x$ and PM, and for the California Air Resources Board ("CARB") to designate a diesel car as a "clean" vehicle, it must produce both low PM and low $NO_x$.

23.    California's strict emission standards posed a serious challenge to Volkswagen's engineers.  In fact, during a 2007 demonstration in San Francisco, the chief of the TDI's research and development team, Wolfgang Hatz, lamented presciently that "[Volkswagen] can do quite a bit

FIRST AMENDED COMPLAINT

and we will do a bit, but 'impossible we cannot do . . . From my point of view, the [CARB standard] is not realistic… I see it as nearly impossible for [Volkswagen]."

24.    It was of the utmost importance to Volkswagen that it achieve (or at least appear to achieve) this "impossible" goal, for it could not legally sell a single vehicle that failed to comply with California emissions regulations.

25.    California's regulator, CARB, requires that automakers complete an application and obtain an Executive Order ("EO"), confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

26.    Thus, in order to successfully grow the U.S. Diesel market and meet its ambitious objectives, it was critical that Volkswagen develop the technology to maintain the efficient, powerful performance of a diesel, while drastically reducing $NO_x$ emission to comply with California emission standards.

27.    This engineering dilemma led to a deep dilemma at Volkswagen that led to proposals for two divergent exhaust gas after treatment technical approaches.  One approach involved a selective catalytic reduction ("SCR") system that proved to be effective but expensive.  The other, which utilized a lean $NO_x$ trap, was significantly cheaper but was less effective and resulted in lower fuel efficiency.

28.    The SCR system utilized the organic compound urea, a post-combustion emission reductant generically referred to as "Diesel Exhaust Fluid" or "DEF."  When injected into the exhaust stream in a catalyst chamber, urea converts $NO_x$ into nitrogen gas, water, and carbon dioxide. The SCR system was expensive, costing $350 per vehicle, and came with other compromises, including, primarily, the need for installation of a DEF tank that would require regular refills. Volkswagen decided to drop the SCR system because the $350 per-vehicle cost was deemed too expensive.

29.    The second strategy, the $NO_x$ traps, involved the storage of $NO_x$ emissions in a catalyst substrate during vehicle operation.  Once the substrate filled up, the system burned off the stored $NO_x$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then converts the $NO_x$ into less harmful emissions.  This method was cheaper

and easier to implement than the SCR system.  The $NO_x$ trap system was less effective at reducing emissions, however, and resulted in lower miles-per-gallon fuel efficiency, directly contradicting one of the key elements (high miles-per-gallon fuel efficiency) necessary to execute Volkswagen's ambitious diesel sales goals.  Accordingly, this option, too, was unacceptable to Volkswagen.

30.     But at Volkswagen, failure was not an option.  According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's ranking officials directed its engineers to find a way to meet emissions standards, including those of California, despite tight budgetary and technical constraints, or suffer the consequences.  For example, former CEO of Volkswagen Aktiengesellschaft, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation," and his leadership was characterized as a "reign of terror."[1]  Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail.  Do it, or I'll find somebody who will." [2]  Piëch was infamous for firing subordinates who failed to meet his exacting standards: "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piech, knowing that if he was displeased, they might be fired instantly."[3]  And so it seems, out of self-preservation, the defeat device was created.

31.     Volkswagen engineers had to find a solution to the "impossible" problem of passing stricter emission standards while maintaining performance and fuel efficiency, all while hamstrung by cost-cutting measures.  And it had to be done fast, because the new diesel vehicles were scheduled for imminent release in the U.S.  Ultimately, Volkswagen ran out of time and instead of being honest and risk being fired, executives, engineers, and others conspired to cheat California emissions standards by installing a "defeat device" in the new diesel vehicles, including Plaintiffs' vehicle, so that those vehicles could "pass" CARB emission testing, and Volkswagen could obtain EOs to sell the vehicles to make its sales targets throughout California.

32.     After it became clear that the TDI engine would not meet California emissions standards by the launch of the Jetta TDI "clean diesel," initially scheduled for 2007 but delayed due

---

[1] Bob Lutx, *One Man Established the Culture That Led to VW's Emissions Scandal*, Road & Track (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.
[2] *Id.*
[3] Doron Levin, *The Man Who Created VW's Toxic Culture Still Looms Large*, Fortune (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

emission testing failure, Volkswagen decided to cheat.  It has been reported that the decision to cheat

CARB, and other regulators worldwide was an "open secret" in Volkswagen's engine development

department,[4] as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limit

[including California's] within the budget and time frame allotted."[5]

33.    All modern engines are integrated with sophisticated computer components to

manage the vehicle's operation, such as an electronic diesel control ("EDC").  The EDC used by

Volkswagen in its TDI engine, including the TDI engine in Plaintiffs' vehicle, is more formerly

referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").  The EDC Unit 17 was tested,

manufactured, and sold by Robert Bosch GMBH ("Bosch").  Upon its introduction, EDC Unit 17

was publicly touted by Bosch as follows:

> … EDC17 … controls every parameter that is important for effective,
> low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17
> can be adapted to match particular requirements, it can be used very
> flexibly in any vehicle segment on all the world's markets.  In addition
> to controlling the precise timing and quantity of injection, exhaust gas
> recirculation, and manifold pressure regulation, it also offers a large
> number of options such as the control of particulate filters or systems
> for reducing nitrogen oxides.  The Bosch EDC17 determines the
> injection parameters for each cylinder, making specific adaptations if
> necessary.  This improves the precision of injection throughout the
> vehicle's entire service life.  The system therefore makes an important
> contribution to observing future exhaust gas emission limits.[6]

34.    EDC Unit 17 was widely used throughout the automotive industry, including BMW

and Mercedes, to operate modern clean diesel engines.  Bosch worked with each vehicle

manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to

manage the vehicle's engine operation.

35.    With respect to Volkswagen's TDI vehicles, including Plaintiffs' vehicle, however,

EDC Unit 17 was also used to enable Bosch and Volkswagen to surreptitiously evade emissions

regulations.  Bosch and Volkswagen worked together to develop and implement a specific set of

---

[4] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[5] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-toerated-breaches-rules.

[6] *See* February 28, 2006, Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en

software algorithms for implementation in Volkswagen's TDI vehicles, which enabled Volkswagen to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).

36.    When carmakers test their vehicles against CARB emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations.  Bosch's EDC Unit 17 gave Volkswagen the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure and even the position of the steering wheel.  When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels.  Once the EDC Unit 18 detected that the emission test was complete, the EDC Unit17 would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently, caused the car to spew the full amount of NOx emissions out on the road, in excess of California's emissions standards.

37.    Thus, in order to obtain the EOs necessary to sell its vehicles in California, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code within the EDC Unit 17 from government regulators.  In other words, Volkswagen lied to the government, its customers, including Plaintiffs, and the public at large.

38.    Because the EOs were fraudulently obtained, and because all Volkswagen vehicles equipped with the TDI engine did not conform to the specifications provided in the EO applications, the vehicles, including Plaintiffs' vehicle, were never covered by valid EOs and, thus, were never legal for sale, nor were they CARB compliant, as presented.  Volkswagen hid these facts from CARB, other regulators, consumers, and Plaintiffs, and it continued to sell and lease the vehicles to the driving public, despite their illegality.

39.    Volkswagen hid the fact of the defeat devices from CARB, such that the EOs were fraudulently obtained.    Volkswagen submitted EO applications that described compliant

specifications and concealed the dual-calibration strategy of the defeat device.  In reality, the vehicles differed in material respects from the specifications described in the EO applications.

40.     Because the EOs were fraudulently obtained, vehicles equipped with the TDI engine, including Plaintiffs' vehicle, were never covered by valid EOs and, thus, were never offered legally for sale.  Volkswagen hid these facts from CARB, and consumers, including Plaintiffs, and it continued to sell and lease the vehicles to the public, including Plaintiffs, despite their illegality.

### Volkswagen's "Clean" Diesel Advertising Campaign

41.     While secretly using defeat devices to bypass California emission testing, Volkswagen publicly declared a landmark victory – touting that it had successfully optimized its engines to maintain legal emissions, while simultaneously enjoying the cost savings and convenience factors of a lean $NO_x$ trap system.  Volkswagen claimed it accomplished this by monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce initial emissions, while neutralizing the remaining ones with a lean $NO_x$ trap to comply with California law.  Volkswagen branded and advertised this purportedly revolutionary technology to American consumers as "CleanDiesel" TDI technology.

42.     Volkswagen's "clean" diesel campaign was built upon a lie. Indeed, the TDI equipped vehicles were so "dirty" that they could not pass the minimum emission standards in California, and Volkswagen had to lie in order to sell them in the California. But, of course, Volkswagen marketed and sold these vehicles without ever disclosing to consumers that they were unlawful to sell or drive due to their high levels of $NO_x$ emissions.

/ / /

/ / /

43.     Volkswagen's "clean" diesel campaign was its key selling point for consumers increasingly concerned about the environment. Its marketing mission was to "get clean-diesel power the recognition it deserves as a true 'green' technology," thereby growing Volkswagen's market share to match its lofty goals.  The objective was to change the way consumers thought of diesel technology, by replacing the mental image of sulfur emissions amid clouds of thick soot with that

of heightened efficiency and reduced $CO_2$ emissions. In fact, the Volkswagen website stated: "This ain't your daddy's diesel. Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI "clean" diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."

44.     Dubbing these diesel engines as "CleanDiesel" was a symptom of the brazen arrogance underlying the fraud. Volkswagen's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing consumers that the TDU equipped vehicles were not merely compliant with California emission regulations, but that they exceeded them. This deception culminated in a Guinness World Record attempt in a 2013 Volkswagen Passat TDI, which ironically won an award for "lowest fuel consumption—48 U.S. states for a non-hybrid car."

45.     Volkswagen professed that its diesel-based technology was equal or superior to hybrid and electric options offered by its competitors. As described by Mark Barnes (COO of Volkswagen America) when asked, "What is the advantage of a diesel over a hybrid?"

> It's a fantastic power train. It gives very good fuel economy. It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very very clean running engine. Clean enough to be certified in all 50 states. It's just like driving a high-powered gasoline engine so you are not giving up one bit of the driving experience that you'd expect from a regular gasoline engine.

46.     Facing skepticism, Barnes had a ready, if imaginative, response to the question, "How do you re-brand something that's dirty like diesel as something that's green?"

> The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older diesels versus the current TDI clean diesel. And one of the things we do is we put coffee filters over the exhaust pipes of both cars. We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter. Ours is very clean. In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it.

47.     Volkswagen also advertised that its vehicles performed better on the road than in test

conditions, touting in a 2008 press release: "While the Environmental Protection Agency estimates the Jetta TDI at an economical 29 mpg city and 40 mpg highway, Volkswagen went a step further to show real world fuel economy of the Jetta TDI. Leading third-party certifier, AMCI, tested the Jetta TDI and found it performed 24 percent better in real world conditions, achieving 38 mpg in the city and 44 mpg on the highway." This discrepancy between the EPA certified mpg figures (which are reverse calculated based on vehicle performance on a dynometer) and the real world mpg figures came about because, in real world driving, Volkswagen's defeat device disabled the full functioning of the $NO_x$ trap system exhaust gas after treatment control (which needed to burn more fuel to work properly), thereby decreasing vehicle operating costs at the expense of massively increased $NO_x$ emissions.

48. Volkswagen distinguished the TDI "clean" diesel engines from other, "stinky, smoky, sluggish" diesels, proclaiming its "eco-conscious" status and of course failing to disclose that the TDI equipped vehicles were "dirty" themselves. These messages were prevalent in Volkswagen's extensive marketing campaign.

49. Some advertisements specifically emphasized the low emissions and eco-friendliness of the vehicles. Others touted the combination of fuel efficiency and power. Yet others addressed the full package, implying that in contrast to the "stinky, smoke, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean, efficient, and powerful all at once.

50. In addition, Volkswagen directed consumers to the www.clearlybetterdiesel.org website, which partnered with affiliates Audi and Porsche, as well as Bosch, Mercedes, and BMW. This website touted the benefits of newly developed diesel technology as "clean" and environmentally friendly. Although it has been scrubbed of all content, the website previously contained false and misleading statements, such as:

> The term "Clean Diesel" refers to innovative diesel engine technology, as well as the latest diesel fuel for vehicles. In contrast to traditional diesel, Clean Diesel is superior, since both the new generation of engines and the fuel itself meet the strictest emission regulations in the U.S. (issued by the state of California). Clean Diesel fuel contains less than 15 parts per million of Sulphur; our Clean Diesel partner vehicles deliver on average 18% higher fuel efficiency while reducing $CO_2$ emissions when compared to corresponding gas models. Since Clean Diesel is not only cleaner but also more fuel-

1  efficient, the new Clean Diesel vehicles are friendlier to both the environment and drivers' wallets throughout the U.S.

2  51.  Volkswagen's partnership with www.clearlybetterdiesel.org falsely or misleadingly

3  portrayed the TDI diesel engine as an environmentally friendly, low emissions choice for discerning

4  and socially responsible consumers.

5  52.  Volkswagen also produced a series of TV advertisements for the U.S. market,

6  including California, intended to debunk myths about diesel engines. One ad, titled, "Three Old

7  Wives Talk Dirty," featured three elderly women debating whether diesels, though "beautiful," are

8  dirty vehicles.  To ostensibly debunk the "Old Wives' Tale" that diesel produced dirty exhaust and

9  hazardous emissions, one of the women held her white scarf to the exhaust to convince the

10  passengers that the exhaust was environmentally friendly and not, in fact, dirty.  She removes the

11  scarf and asks her friends, "see how clean it is?" Like others in Volkswagen's "clean" diesel

12  campaign, this ad falsely or misleadingly portrayed the exhaust emissions from the TDI equipped

13  vehicles as clean and safe. In reality, TDI equipped vehicles actually emitted invisible and extremely

14  hazardous levels of NOX.

15  53.  These themes extended to print brochures at dealerships and to VW's website.  The

16  brochures emphasized that VW's "clean" diesel was "clean," "green," and low emission. For

17  example, a "2012 Volkswagen Family" brochure for all VW models, states:

18
19  Let TDI "clean" diesel set you free from the filling station. Our TDI engines achieve astonishing mileage and range—up to 43 highway
20  mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. That's all thanks to the TDI
21  technology that uses a direct injection system and runs on ultralow-sulfur diesel, helping reduce sooty emissions by up to 90%
22  compared to previous diesel engines. On most models, you can even choose the available DSG automatic transmission with
23  Tiptronic to take that turbo engine to a whole new level.

23  54.  Similarly, a "2013 Volkswagen Family" brochure, applicable to all models, states:

24
25  When you've had your fill of filling stations, hit the road in your TDI "clean" diesel Volkswagen. These engines achieve astonishing
26  mileage and range-up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance.
27  That's all thanks to the TDI technology that uses a direct injection system, and runs on ultra-low-sulfur diesel, helping
28  reduce emissions by up to 90% compared to previous diesels. Far and away, it's our best diesel yet

-13-

55.     And a 2012 "Volkswagen TDI "clean" diesel" brochure for the six models of Volkswagen TDIs then on the market (Jetta, Jetta SportWagen, Golf, Passat, Beetle, and Touareg) states:

> These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler. Clean diesel vehicles meet the strictest EPA standards in the U.S. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.
>
> . . .
>
> Think beyond green. TDI represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging eco-conscious products and behaviors. Join us in being more responsible on the road and on the planet.

56.     Further, a 2010 TDI Jetta and Jetta SportWagen brochure states:

> The 2.0L "clean" diesel engine gives you 140jp and 236 lbs-ft of torque. This engine is the toast of Europe for its quickness, low emissions, and fuel efficiency—a staggering 38 city/44 highway mpg (automatic) based on real-world AMCI-certified testing (30 city/42 highway mpg. EPA estimates).
>
> . . .
>
> Jetta TDI "clean" diesel offers fuel efficiency, power, performance, and a $1,300 tax credit from Uncle Sam because it qualifies as an Advanced Lean Burn Credit. Or, in other words, lean, mean, cleaner burning machines. Volkswagen believes in delivering a no-compromise German-tuned auto that performs, and still leaves a small carbon footprint. The Volkswagen TDI engine is cleaner than conventional diesels, emitting as much as 95% less soot than previous diesel engines, as well as a reduction in oxides of nitrogen and sulfur. It's powerful, with the kind of low-end torque that racers and tuners demand. It's efficient, using a turbocharger and smart exhaust design to burn fuel more effectively. So much so, in fact, that Volkswagen was the first automaker to make clean diesel cars certified in all 50 states. And best of all, it will help save you money with an out-of-this-world AMCI-estimated mileage of 38 city/44 highway mpg (automatic) and over 594 miles on a single tank of fuel.
>
> There's even a Jetta SportWagen TDI "clean" diesel, with the same astonishing clean diesel technology, plus a whopping 66.9 cubic feet of cargo room.

57.     And a Volkswagen 2011 Golf TDI brochure states:

> Regardless of which Golf model you get, you'll be seeing a lot fewer gas stations and a lot more road. The 2.5L Golf comes

-14-

standard with a 170-hp, in-line five-cylinder engine with 177 lbs/ft torque and impressive fuel efficiency rated at 23 city/30 highway mpg. Opt for the Golf TDI model and you'll enjoy a turbocharged clean diesel engine with 140 hp and 236 lbs/ft of torque that will run you even farther at a whopping 30 city/42 highway mpg. That's up to 609 miles per tank. And you'll do it all with 95 percent fewer sooty emissions than diesel engines of old, making it cleaner for both you and the planet. So whether you're in the market for IntelliChoice's 2010 "Best Overall Value Compact Car over $17,000," or you want to go for a variation on that theme and get the ever-popular TDI model, you can't go wrong. In fact, you can go very right for a long, long time.

58.     A Volkswagen 2012 Passat TDI Brochure states:

Let the Passat TDI "clean" diesel set you free from the filling station. It achieves an astonishing 43 highway mpg and travels 795 miles on a single tank without sacrificing one bit of turbocharged performance. That's all thanks to its TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines. You can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.

. . .

The TDI "clean" diesel engine was designed and engineered around one simple belief: driving is more fun than refueling. So besides the reduced emissions and torque-filled benefits you experience behind the wheel of the Passat TDI, it also saves you money at the pump.

59.     A Volkswagen 2013 Beetle TDI brochure states:

Start the TDI® "clean" diesel model and hear the surprisingly quiet purr of the first clean diesel Beetle, designed for both power and efficiency.

/ / /

60.     A Volkswagen 2014 Beetle TDI brochure states:

2.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Beetle TDI has lower $CO_2$ emissions compared to 84% of other vehicles. So every getaway you make will be a cleaner one.

61.     A Volkswagen 2014 TDI Touareg brochure states:

3.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Touareg TDI has lower $CO_2$ emissions compared to 88% of other vehicles. So every getaway you make will be a clean one.

-15-

FIRST AMENDED COMPLAINT

**Volkswagen Profit's from Selling Vehicle's Equipped with the Defeat Device**

62.     Volkswagen's massive advertising campaign for the TDI equipped vehicles proved highly successful, as Volkswagen took a commanding lead in U.S. diesel vehicle sales. Volkswagen's diesel vehicles were profiled on environmental websites and blogs as the responsible choice, relying on Volkswagen's representations of high mileage and low emissions.

63.     And the success of Volkswagen's advertising campaign resulted in skyrocketing sales. In 2007, Volkswagen sold 230,572 cars in the United States and a negligible number of those were diesel vehicles.  In fact, in 2007 only approximately 16,700 light-duty diesel vehicles were sold in the United States.  As Volkswagen released its "clean" diesel lineup and fraudulent advertising campaign, sales of TDI vehicles grew dramatically, from 43,869 in 2009 to a peak of 111,285 in 2013.  This largely accounted for Volkswagen's sales growth to over 400,000 sales in 2013, nearly double the sales in 2007. Likewise, the TDI vehicles contributed significantly to Audi's growth from 93,506 sales in 2007 to 182,011 in 2014.

64.     Volkswagen reaped considerable benefit from their fraud, charging premiums of thousands of dollars for the "clean" diesel models of the TDI vehicles.

65.     Volkswagen also engaged in an aggressive lobbying campaign for federal tax credits for the TDI vehicles, akin to the credits offered for electric cars.  These efforts were met with some success, as many of the TDI vehicles were deemed eligible for federal income tax credits in order to spur "clean" diesel technology.  In fact, at least $78 million was earmarked for TDI Jetta buyers in 2009 and 2010.

66.     Volkswagen's fraudulent scheme started to unravel approximately five years after Volkswagen introduced its first diesel model containing the defeat device into the U.S. stream of commerce.  In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the International Council on Clean Transportation ("ICCT"), which found that certain of the TDI equipped vehicles' real world NOX and other emissions exceeded the allowable CARB emission standards.

67.     The ICCT researchers had been comparing the real-world performance of "clean" diesel vehicles in Europe with reported results and noted numerous discrepancies. Since California

-16-

emission regulations were significantly more stringent than its European counterparts, the ICCT sought to test the equivalent California "clean" diesel cars, presuming that they would run cleaner. West Virginia University's team of emissions researchers was a qualified and enthusiastic partner, as they had already been engaged in the study of heavy truck emissions.

68.     Shockingly, the study showed that, contrary to testing lab results, real world driving of Volkswagen "clean" diesel vehicles produced levels of $NO_x$ up to 40 times higher than legal limits promulgated by the CARB.

69.     The results of this study prompted an immediate investigation by CARB, who demanded an explanation from Volkswagen.  Despite knowing that the TDI vehicles contained emission systems designed for fraudulent purposes—and defeat devices intentionally designed to comply with California emission standards on a test bench but not under normal driving operation and use— Volkswagen failed to come clean. Instead, Volkswagen denied the allegations and blamed faulty testing procedures.

70.     In December 2014, Volkswagen issued a recall purportedly to update emission control software in the TDI vehicles, and CARB conducted follow-up testing of the TDI vehicles in the laboratory and during normal road operation. CARB attempted to identify the source and nature of the TDI vehicles' poor performance and determine why their on-board diagnostic systems did not detect the increased emissions.  None of the technical issues suggested by Volkswagen adequately explained the $NO_x$ test results as confirmed by CARB.

71.     Dissatisfied with Volkswagen's explanations, California government officials finally threatened to withhold the emissions certifications for Volkswagen's 2016 diesel vehicles until it adequately explained the anomaly of the higher emissions. Then, and only then, did Volkswagen finally relent and start to lift the curtain on its fraudulent scheme.

72.     On September 3, 2015, Volkswagen officials finally disclosed at a meeting with CARB that it had installed a sophisticated software algorithm on the 2.0-liter TDI vehicles, which could detect when the car was undergoing emission testing on a test bench and switch the car into a cleaner running mode.

FIRST AMENDED COMPLAINT

73.     On September 18, 2015, CARB sent a letter to Volkswagen advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the a notice of violation sent previously by another agency. .

74.     On September 20, 2015, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines.

75.     Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

76.     On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by California regulators.

## PLAINTIFFS' EXPERIENCE

77.     The vehicle was equipped with a TDI diesel engine.

78.     On January 24, 2015, Plaintiffs visited Serramonte Volkswagen in Colma, California, with hopes of purchasing a new vehicle.  Plaintiffs walked the dealership in search of a vehicle to meet Plaintiffs' needs.  Plaintiffs were specifically searching for a vehicle that was fuel efficient and had low emissions.  In searching the car inventory on the car lot, Plaintiffs reviewed the window stickers of 2014 Volkswagen Jetta Sportwagen TDI vehicles that caught their eyes.  The window stickers on most of these vehicles identified the vehicles as having low emissions.  Plaintiffs identified a 2014 Volkswagen Jetta Sportwagen TDI they were interested in purchasing. Plaintiffs' conversations with the salesman and manager and the window sticker on the vehicle reinforced Plaintiffs' belief that the vehicle was in fact equipped with a clean diesel engine that had low emission output. The salesman never disclosed to Plaintiffs that the vehicle was not a low emission vehicle.  Plaintiffs relied on the statements on the window sticker and marketing materials he had received about the 2014 Volkswagen Jetta Sportwagen TDI and the TDI diesel engine.

79.     Prior to purchasing the vehicle, Plaintiffs reviewed marketing brochures, viewed television commercials and/or heard radio commercials about the qualities of the Volkswagen's TDI engine.  Plaintiffs also relied on Volkswagen's reputation as an established and experienced auto

manufacturer; Plaintiffs relied on the statements made during the sales process by Volkswagen's agents, on window stickers, and within the marketing brochures provided by Volkswagen regarding it being a "green" vehicle.  However, Volkswagen and its authorized agents did not publicly or privately disclose to Plaintiffs any information about the defeat devices. These omissions were material to Plaintiffs' decision to purchase the vehicle.  Had Volkswagen and/or its authorized agents publicly or privately disclosed the existence of the defeat device and the truth about the TDI's emissions before Plaintiffs purchased the vehicle, Plaintiffs would have been aware of such disclosures, and would not have purchased the vehicle.

## FIRST CAUSE OF ACTION

**(Fraud in the Inducement – Intentional Misrepresentation)** – *Against Manufacturer Defendant ONLY*

80.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

81.     Defendant Volkswagen made multiple public representations about quantifiable qualities of the TDI engine, including statements regarding its emissions, its compliance with government regulations, fuel efficiency, power, and drivability.

/ / /

/ / /

82.     Defendant Volkswagen drafted, produced, and distributed marketing brochures to the public containing factual representations about the TDI engine.  Defendant Volkswagen also engaged in a nationwide television and print advertising campaigns containing factual representations about the TDI engine.  Volkswagen's marketing the Vehicle represented the TDI engine's "green" technology, as further described in paragraphs 38-58, above.

83.     Unfortunately, the Vehicle, as delivered to Plaintiffs, was equipped with a "defeat device" that was specifically designed to circumvent government environmental regulations, including California emissions standards, and to defraud the public at large, including the Plaintiffs.

84.    The defeat device was not a defect exclusive to Plaintiffs' Vehicle but was intentionally designed by Defendant with the intent to defraud government regulators and the public by convincing them that TDI engine equipped vehicles actually complied with government environmental regulations, including California's emissions standards.  Volkswagen had exclusive knowledge of this fact and concealed information to fraudulently induce Plaintiffs and other consumers into purchasing vehicles equipped with the TDI engine and the defeat device.  As such, the defeat device is more than just a non-conformity to the Vehicle's warranties, but, rather, the basis of a wide ranging fraud and a breach of a separate duty that arises from Volkswagen's exclusive knowledge and concealment of the defeat device.

85.    Volkswagen made such representations regarding TDI engine despite its extensive internal knowledge of the defeat device and the poor emissions performance.  Volkswagen's knowledge of the defeat device and intentional fraud is laid out in detail above.

86.    Defendants intended that Plaintiffs rely on the representations made in marketing brochure and add campaigns related to the "clean diesel" TDI engine in inducing Plaintiffs to purchase the Vehicle.

87.    Plaintiffs reasonably relied on Defendant's representations related to the Vehicle being "clean diesel" and "green: because Volkswagen was the manufacturer of the vehicle and claimed to have performed and relied upon extensive pre-release testing of the Vehicle's emissions in compliance with California's rigorous emissions standards.  Defendant Volkswagen was in a superior position of knowledge.

88.    Plaintiffs were harmed by purchasing a vehicle that Plaintiffs would not have purchased had they known the true facts about the defeat device and the Vehicle's actual emissions.

89.    Plaintiffs' reliance on Defendants' representations about the Vehicle's "green" qualities was a substantial factor in Plaintiffs' harm, as Volkswagen and its agents were the exclusive source of information about the emissions qualities, the defeat device, and the intent to defraud the public.

**SECOND CAUSE OF ACTION**

FIRST AMENDED COMPLAINT

**(Fraud in the Inducement – Concealment)** – *Against Manufacturer Defendant ONLY*

90.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

91.     Defendant Volkswagen and its agents intentionally concealed and failed to disclose facts relating to TDI defeat device and the Subject Vehicle's non-conformance with California emission standards.

92.     Defendant Volkswagen was the only party with knowledge of the TDI defeat device because that knowledge came from an intentional scheme to defraud government regulators and consumers, including CARB and the Plaintiffs.  None of this information was available to the public, nor did Defendant publicly or privately disclose any of the information to Plaintiffs.  Volkswagen had exclusive knowledge of the defect.

93.     Defendant Volkswagen actively concealed information from the public, preventing Plaintiffs from discovering any of the concealed facts regarding the defeat device and the truth about the TDI engine emissions.

94.     Prior to the date of sale, on the date of sale, and on the date of each of the repair attempts, Defendant had an opportunity to disclose to Plaintiffs, but instead concealed from and failed to disclose to Plaintiffs, any of the known irreparable issues with the Vehicle, including the existence of the TDI defeat device.

95.     Defendant Volkswagen intended to deceive Plaintiffs by concealing the existence of the TDI defeat device, in an effort to sell the Vehicle at a maximum price.

96.     Prior to the sale of the Vehicle Defendant Volkswagen knew that the TDI defeat device was intended to use it to defraud CARB and the general public, including Plaintiffs. Defendant Volkswagen specifically designed the TDI defeat device to fraudulently circumvent California emissions regulations and trick the public into purchasing vehicles that could not deliver on their emissions promises.  Defendant Volkswagen intended the Vehicle to be sold to the public, including the Plaintiffs with the fraudulent defeat device.

97.     Plaintiffs did not know about the TDI defeat device, the Vehicle's non-conformance with California emissions regulations, or Volkswagen's plan to defraud consumers at the time of sale.

98.     Had Defendant Volkswagen and/or its agents publicly or privately disclosed the existence of the TDI defeat device or the Vehicle's failure to conform to California emissions standards to Plaintiffs at or prior to the sale, Plaintiffs would not have purchased the Vehicle.

99.     Plaintiffs were harmed by Defendant's concealment of the TDI defeat device because Plaintiffs were induced to enter into the sale of a vehicle that Plaintiffs would not have otherwise purchased.

100.     Defendant's concealment of the defeat device and the fact that the Vehicle failed to conform to California emissions regulations was a substantial factor in causing Plaintiffs' harm.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## THIRD CAUSE OF ACTION

**(Violation of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.)) –** *Against Manufacturer Defendant ONLY*

101.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

102.     The Subject Vehicle is a "Good" as defined in Civil Code, section 1761, subdivision (a).

103.     Volkswagen is subject to the Consumer Legal Remedies Act, Civil Code, section 1750 et seq., as each is a "Person" as defined in Civil Code, section 1761, subdivision (c).

104.     Plaintiffs are a "Consumer" as defined in Civil Code, section 1761, subdivision (d).

105.    The Vehicle Code, section 11713, et seq. regulates the advertising and sale of motor vehicles.

106.    In violation of the foregoing statutes, Volkswagen has engaged or attempted to engage in the following unfair methods of competition and unfair or deceptive acts or practices and these methods, acts, or practices were undertaken in a transaction intended to result or which resulted in the sale of goods or services to a consumer.

107.    Plaintiffs relied on Volkswagen's representations in purchasing the vehicle.

108.    The foregoing wrongful acts violate the following subdivisions of the CLRA: (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or he does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (9) Advertising goods or services with intent not to sell them as advertised; (14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; (16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.  (Civ. Code, § 1770, subd. (a))

109.    Volkswagen has violated the Consumers Legal Remedies Act (CLRA), California Civil Code sections 1770(a) (7), (9), (14), and (16), by engaging in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions that were intended to result and did result in the sale and lease of goods to consumers.

110.    In connection with the sale of the Subject Vehicle to Plaintiffs, Volkswagen failed to disclose—at the point of sale or otherwise— material information about the Subject Vehicle— namely, that the Subject Vehicle is equipped with a defeat device intended to defeat emissions tests and regulations, including California emissions standards.

111.    As a direct and proximate result of Volkswagen's conduct, Plaintiffs have been

-23-

harmed in that Plaintiffs purchased a vehicle they otherwise would not have, paid more for the Subject Vehicle than they otherwise would, and is left with a vehicle of diminished value and utility because of the defect. Meanwhile, Volkswagen has sold more vehicles equipped with a TDI engine with the defeat device than it otherwise could have and charged inflated prices for vehicles equipped with a TDI engine with the defeat device, unjustly enriching itself thereby.

112.    Volkswagen and its authorized dealership represented to Plaintiffs that by entering into the Retail Installment Sales Contract to purchase the Vehicle, Plaintiffs were securing the benefit of a warranty by Volkswagen to maintain the utility and performance of the vehicle, including performance in compliance with California's emissions regulations, or to provide compensation in the event of a failure in utility or performance.  Volkswagen was aware of its intentional scheme to defraud consumers, such as Plaintiffs, and government bodies, such as CARB, and its inability to repair the vehicle to conform to the specifications in advertisements and the warranty.  Volkswagen represented that the sales transaction conferred an obligation that it did not involve in violation of the CLRA.

113.    Pursuant to the Consumer Legal Remedies Act, Civil Code, section 1750 et seq., on February 8, 2017, Plaintiffs notified Volkswagen in writing by certified mail, return receipt requested, of the alleged violations and demanded that Volkswagen correct, repair, replace, or otherwise rectify the violations.

114.    Volkswagen failed to offer a compliant correction within 30 days of being notified of its violation. Plaintiff amended the complaint to request monetary damages.

115.    In committing the above wrongful acts, Volkswagen was guilty of oppression, fraud, or malice, because the acts were perpetrated pursuant to Volkswagen's plan, scheme, or company policy to deceive, defraud, mislead, or take unfair advantage of buyers of Volkswagen's vehicles equipped with the TDI engine with a defeat device.

116.    The foregoing fraudulent and wrongful acts by Volkswagen, as alleged above, were authorized and ratified by Volkswagen's officers, directions, and/or mangers, including, but not

-24-

limited Volkswagen's director of marketing.  Volkswagen's agents or employees also committed the wrongful acts set forth above with the foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or managing agent of Volkswagen pursuant to an implicit or explicit company plan, scheme, or policy regarding the advertising and sale of Volkswagen vehicles equipped with the defeat device.  Alternatively, the aforementioned wrongful acts were committed by an officer, director, or managing agent of Volkswagen.

117.  As a direct result of the Volkswagen's acts and/or omissions, Plaintiffs have been injured as set forth herein.

118.  Plaintiffs seek the entry of a preliminary and permanent injunction requiring Volkswagen to disclose fully, prior to the sale, the inherent engine defects in vehicles equipped with the TDI engine with a defeat device and the defects buyers can expect to experience with these vehicles and desist from selling these vehicles without the foregoing pre-sale disclosure.  Also, Plaintiffs seek an injunction issued to prevent Volkswagen from refusing to acknowledge its scheme to intentionally defraud consumers, including Plaintiffs, and the California CARB.

/ / /

/ / /

119.  Injunctive relief is necessary in this case because (1) the legal remedies are inadequate and (2) the state has inherent power to halt deceptive conduct.  Without injunctive relief, Volkswagen will continue to victimize California buyers of Volkswagen vehicles equipped with the TDI engine with defeat device.  The repetition of Volkswagen's deceptive sales policies will result in irreparable harm.  Without injunctive relief, Volkswagen can simply offer damages to the deceived customers who use it in order to continue their deceptive practices.  Additionally, injunctive relief is specifically authorized by the Consumers Legal Remedies Act to eradicate unfair and deceptive business practices.

120.  The foregoing injunction is sought to protect the public from these predatory methods, acts, or practices.

1

121.    Plaintiffs also seek attorney fees and costs.

2

3

#### **FOURTH CAUSE OF ACTION**

4

**(Violation of the Song-Beverly Act – Breach of Implied Warranty) – *Against All Defendants***

5

122.    Plaintiffs incorporate herein by reference each and every allegation contained in the

6

preceding and succeeding paragraphs as though herein fully restated and re-alleged.

7

123.    Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil

8

Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or

9

household purposes, and Plaintiffs have used the vehicle primarily for those purposes.

10

124.    Plaintiffs are a "buyer" of consumer goods under the Act.

11

125.    Defendant Ford is a "manufacturer" and/or "distributor" under the Act.

12

126.    Volkswagen and its authorized dealership at which Plaintiffs purchased the Vehicle

13

had reason to know the purpose of the Vehicle at the time of sale of the Vehicle.  The sale of the

14

Vehicle was accompanied by an implied warranty of fitness.

15

127.    The sale of the Vehicle was accompanied by an implied warranty that the Vehicle

16

was merchantable pursuant to Civil Code section 1792.

17

/ / /

18

128.    The Vehicle was not of the same quality as those generally acceptable in the trade

19

because it was equipped with a defeat device.

20

129.    The Vehicle was not fit for the ordinary purpose for which such goods are used

21

because it was equipped with a defeat device.

22

130.    The Vehicle did not measure up to the promises or facts stated on the container or

23

label because it was equipped with a defeat device.

24

131.    The Vehicle did not measure up to the promises or facts stated on the container or

25

label because it was equipped with defeat device intended to deceive emissions tests and regulators,

26

including CARB and California emissions standards.

27

132.    Plaintiffs are entitled to justifiably revoke acceptance of the Vehicle under Civil Code

28

section 1794, *et seq*; Plaintiffs hereby revoke acceptance of the Vehicle.

133.    Plaintiffs are entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq.*

134.    Plaintiffs are entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq.* and Commercial Code section 2711.

135.    Plaintiffs are entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq.*

136.    Plaintiffs are entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant(s), as follows:

1.    For general, special and actual damages according to proof at trial;

2.    For rescission of the purchase contract and restitution of all monies expended;

3.    For incidental and consequential damages according to proof at trial;

4.    For prejudgment interest at the legal rate;

5.    For injunctive and equitable relief;

6.    For punitive damages pursuant to Civil Code section 3294 and punitive damages pursuant to Civil Code section 1780;

7.    For reasonable attorney's fees and costs of suit; and

8.    For such other and further relief as the Court deems just and proper under the circumstances.

Plaintiffs, WHITNEY S. GRAVEL and MIKE GRAVEL, hereby demand trial by jury in this action.

Dated:  March 17, 2017                                           **O'CONNOR & MIKHOV LLP**

FIRST AMENDED COMPLAINT

1

2
       _____/s/ Alastair Hamblin_____

3
Steve Mikhov (SBN 224676)
Alastair Hamblin (SBN 282044)

4
Amy Morse (SBN 290502)
Attorneys for Plaintiffs,

5
WHITNEY S. GRAVEL and
MIKE GRAVEL

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

1

2

PROOF OF SERVICE

(F.R.C.P. Rule (b)(2))

3

4

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

5

I served the foregoing document described as:

6

**FIRST AMENDED COMPLAINT**

7

8

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

9

10

11

12

13

14

Laura K. Oswell, Esq.
**SULLIVAN & CROMWELL LLP**
1870 Embarcadero Road
Palo Alto, CA 94303
**Attorneys for Defendants,**
**VOLKSWAGEN GROUP OF**
**AMERICA, INC. and MATHEW**
**ENTERPRISE, Inc., d/b/a,**
**SERRAMONTE VOLKSWAGEN**
**(VIA MAIL ONLY)**

Moses Lebovits, Esq.
**SCHONBUCH & LEBOVITS LLP**
**DANIELS FINE ISRAEL**
1801 Century Park East, Floor 9
Los Angeles, CA 90067
**Associated Counsel for Plaintiffs,**
WHITNEY S. GRAVEL and MIKE GRAVEL
(via E-mail only)

15

16

17

18

19

XX   BY MAIL:  I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

20

21

22

XX   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

23

24

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

25

26

Executed on March 17, 2017 at Los Angeles, California.

27

28

 /s/  Era Mitchell
ERA MITCHELL

-1-

**PROOF OF SERVICE**
